**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**
**www.flsb.uscourts.gov**

In re:                                                      Case No.: 23-18204-RAM

**BLANCA CECILIA JIMENEZ,**                  Chapter 13
                **Debtor.**
_____/

### CARMEN GOENAGA AND JACQUELINE GOENAGA, AS PERSONAL REPRESENTATIVE, OF THE ESTATE OF BERNADO GOENAGA'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY

Secured Creditors, CARMAN GOENAGA and JACQUELINE GOENAGA, as personal representatives of the estate of Bernardo Goenaga ("Movant" or "Estate"), pursuant to 11 U.S.C.§362, Local Rule 4001-1, Federal Rule of Bankruptcy Procedure 4000 and all other applicable law files this its Motion for Relief from the Automatic Stay and in support there of states:

1.      On or about May 8, 2012, Defendants Jimenez and Pozo, executed and delivered that certain Promissory Note to the Estate's predecessor, Bernardo Goenaga, in the principal amount of $135,000.00 (the "Note"). Contemporaneously therewith, Defendants Jimenez and Pozo, executed and delivered that certain Mortgage to the Estate's predecessor, Bernardo Goenaga (the "Mortgage"), securing the payment of the Note. The Mortgage was recorded on May 18, 2012, in Official Records Book 28116, at Page 3248, of the Public Records of Miami-Dade County, Florida. Along with the Note and Mortgage, the Defendants Jimenez and Pozo also executed and delivered an Assignment of Leases, Rents and Profits dated May 8, 2022 (the "Assignment"), and which was recorded in Official Records Book 28116, at Page 3264 in the Public Records of Miami-Dade County, Florida. A true and correct copy of the Note, Mortgage

and Assignment are attached hereto as **Composite Exhibit "A"** (The Note, the Mortgage and the Assignment may sometimes hereinafter be collectively referred to as the "Loan Documents").

2.    The real property which secures the Mortgage is more particularly described as follows:

> **Lot 18, Block 32, Fourth Addition to Essex Village, according to the plat thereof as recorded in Plat Book 46, Page 63, Public Records of Miami-Dade County, Florida, and having a street address of 57 Essex Avenue, Hialeah, FL  33010, and folio identification no. 04-3117-014-1210.**

(the "Mortgaged Property").

3.    Plaintiff owns and holds the Loan Documents and has acquired all legal rights to bring this motion  and is the real party in interest.

4.    Debtors filed bankruptcy in 2015, Case # 15-20695-AJC and listed the mortgage indebtedness owed to Bernardo Goenaga in the amount of $148,000.00. See attached Exhibit "B". The Chapter 13 Plan provided that the subject loan indebtedness would be paid direct to the now deceased  Bernardo Goenega.

5.    The Debtors Defaulted on its payments and on July 19, 2023 the Estate filed a Verified Complaint for Foreclosure and other relief against in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Case No.132023CA01983101.

6.    The indebtedness owed to the Estate at the time of the petition date is $193,834.99. See Affidavit and Indebtedness Worksheet attached hereto as Composite Exhibit "C ".

7.    Debtors have filed a Chapter 13 Plan in this bankruptcy case providing no treatment of secured claims.

8.    Based on the fact that the Debtor is not proposing to treat the secured claim of the Estate under the Plan and there is a pending foreclosure action, stay relief is appropriate under 11 U.S.C.§362 (d) (2) as the property is not necessary for an effective reorganization.

9.     Additionally, the subject Note has already ballooned and the Debtors have no stated means to pay the indebtedness under a plan or otherwise. This is clearly a Chapter 13 case filed for the sole purpose of thwarting the pending foreclosure action.

10.    The undersigned has consulted with Debtors counsel and does not yet have a definitive response as to Debtor's position regarding this Motion.

**WHEREFORE**, Movant, CARMEN GOENAGA and JACQUELINE GOENAGA, as Personal Representative of the Estate of Bernado Goenaga, requests that this Court enter an order granting its Motion For Relief from the Automatic Stay and such other and further relief this court deems just and proper.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served via *U.S. Mail and/or electronically via CM/ECF to all parties registered to receive electronic notice and as noted on the attached service list*, on this  1st  day of November, 2023.

Dated: November 1, 2023

Respectfully submitted,

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court of the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court as set forth in Local Rule 2090-1(A).

GAMBERG & ABRAMS
Counsel for Carmen & Jacqueline Goenaga
1213 S.E. Third Avenue, Second Floor
Fort Lauderdale, Florida 33316
Telephone:     (954) 523-0900
Facsimile:      (954) 915-9016
E-mail: tabrams@tabramslaw.com

By: /s/ Thomas L. Abrams
     Thomas L. Abrams, Esquire
     Florida Bar No. 764329

## SERVICE LIST

***Notice Service via CM/ECF electronic filing:***

Thomas L Abrams on behalf of Creditor Carman Goenaga
tabrams@tabramslaw.com,
fcolumbo@tabramslaw.com;abrams.thomasl.b132292@notify.bestcase.com

Thomas L Abrams on behalf of Creditor Jacqueline Goenaga
tabrams@tabramslaw.com,
fcolumbo@tabramslaw.com;abrams.thomasl.b132292@notify.bestcase.com

Antonio Alonso on behalf of Creditor Deutsche Bank Trust Company Americas, as Trustee for
Residential Accredit Loans, Inc., Mortgage Asset-Backed Pass-Through Certificates, Series 2006-
QO6
alonsoa@aapalaw.com, bkecf@delucalawgroup.com

Diego Mendez on behalf of Debtor Blanca Cecilia Jimenez
info@mendezlawoffices.com, ana.solano@mendezlawoffices.com;mlolawbestcase@gmail.com

Nancy K. Neidich
e2c8f01@ch13miami.com, ecf2@ch13miami.com

Office of the US Trustee
USTPRegion21.MM.ECF@usdoj.gov

By: /s/ Thomas L. Abrams
    Thomas L. Abrams, Esquire

# COMPOSITE
# EXHIBIT
## "A"

# PROMISSORY NOTE

May 8, 2012

For value received the undersigned jointly and severally promises to pay to the order of Bernardo Goenaga the principal sum of One Hundred Thirty Five Thousand and 00/100 Dollars (U.S.$135,000.00), together with interest thereon from date. The Initial Rate shall be 7.00%, at no time during the term of this loan shall the rate be less than 7.00% per annum on the balance from time to time remaining unpaid. The said principal and interest in lawful money of the United States at 600 Biltmore Way 509, Coral Gables, Florida 33134-7530, or such place as may be designated by writing notice from the holder hereof, on the date and in the manner following:

I will make Thirty Six (36) consecutive monthly payments of interest only beginning July 1, 2012. My initial monthly payment of interest only shall be in the amount of Seven Hundred Eighty Seven and 50/100 Dollars ($7887.50) and maturing on June 1, 2015 with a final Thirty Sixth (36th) Balloon payment of all outstanding principal and accrued interest.

This Note with Interest is secured by a mortgage on real estate, of even date herewith, made by the maker hereof in favor of said payee, and shall be construed according and enforced according to the laws of the state of Florida. If the Note holder has not received the full amount of any monthly payments by the end of ten (10) days after the date is due, Maker shall pay a late charge to the Note Holder. The amount of the charge will be five percent (5%) of the overdue payment.

If default be made in the payment of any of the sums of interest mentioned herein or in said mortgage, the entire principal sum and accrued interest shall at the option of the holder hereof become at once due and collectable without notice, time being of the essence, and said principal sum and accrued interest shall both bear interest from such time until paid at a rate of 18% or the highest rate allowable of the state of Florida. Failure to exercise this option shall not constitute a waiver of the right to exercise the same in the event of any subsequent default.

Each person liable hereon whether maker or endorser, hereby waives presentment, protest, notice of protest and notice of dishonor and agree to pay all costs, including a reasonable attorney's fee, whether suit be brought or not if, after maturity of this Note or default hereunder, or under said mortgage, counsel shall be employed to collect this Note or to protect the security of said Mortgage.

Whenever used herein the terms, "Holder", "Maker" and "Payee" shall be construed in the singular or plural as the context may require or admit.

Blanca Cecilia Jimenez

The state documentary tax due on this Note has been paid on the Mortgage securing this indebtedness.



CFN 2012R0355422
OR Bk 28116 Pgs 3248 - 3263; (16pgs)
RECORDED 05/18/2012 09:56:50
MTG DOC TAX 472.50
INTANG TAX 270.00
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

After Recording Return To:
Jorge V. de Ona

Elite Title Services, Inc.

395 Alhambra Circle

Coral Gables, FL  33134

_____ [Space Above This Line For Recording Data] _____

This is a Balloon Mortgage and the Final Principal Payment or the Principal Balance Due upon maturity shall be the outstanding principal together with any accrued interest, if any, and all advancements made by the mortgage under the terms of this mortgage.

# MORTGAGE

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21.  Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)     "**Security Instrument**" means this document, which is dated May 8, 2012, together with all Riders to this document.
(B)     "**Borrower**" is Blanca Cecilia Jimenez, joined by her husband Candido Pozo. Borrowers are the mortgagor under this Security Instrument.
(C)     "**Lender**" is Bernardo Goenaga, existing under the laws of the State of Florida.  Lender's address is 600 Biltmore Way 509, Coral Gables, FL 33134-7530.  Lender is the mortgagee under this Security Instrument.
(D)     "**Note**" means the promissory note signed by Borrower and dated May 8, 2012.  The Note states that Borrower owes Lender One Hundred Thirty Five Thousand and No/100 Dollars (U.S. $135,000.00) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than June 1, 2015.
(E)     "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."
(F)     "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT            Form 3010    1/01    (page 1 of 16 pages)

(G)   **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

- ☐ Adjustable Rate Rider
- ☐ Balloon Rider
- ☐ 1-4 Family Rider
- ☐ Condominium Rider
- ☐ Planned Unit Development Rider
- ☐ Biweekly Payment Rider
- ☐ Second Home Rider
- ☐ Other(s) [specify] ____

(H)   **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(I)   **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(J)   **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(K)   **"Escrow Items"** means those items that are described in Section 3.

(L)   **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(M)   **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(N)   **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(O)   **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P)   **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

B.J  CP

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender, the following described property located in the County of Miami-Dade, Florida:

> Lot 18, in Block 32, of ESSEX VILLAGE FOURTH EDITION, according to the Plat thereof, as recorded in Plat Book 46, at page 63, of the Public Records of Miami-Dade County, Florida.

which currently has the address of 57 Essex Avenue, Hialeah, Florida 33010 ("Property Address").

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1.      **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check,

provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

    **2.**    **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

    **3.**    **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid

under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.    **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall

 

pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.    **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance

coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.    **Occupancy.**    Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.    **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3010    1/01    *(page 7 of 16 pages)*

restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8.    Borrower's Loan Application.**  Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan.   Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9.    Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**  If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off.  Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10.    Mortgage Insurance.**  If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be

available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a)     Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b)     Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated

BW  CP

automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

　　11.　　**Assignment of Miscellaneous Proceeds; Forfeiture.**　　All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument.




Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12.    Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13.    Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14.    Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the

amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if

Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as

either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21.    **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22.    **Acceleration; Remedies.**   Lender shall give notice to Borrower prior to



acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

25. **Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.


BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:


_____
Witness:

_____                    Blanca Cecilia Jimenez


_____
Witness:

_____                    Candido Pozo


FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3010    1/01    *(page 15 of 16 pages)*

LAST PAGE

State of Florida

County of Miami-Dade

The foregoing instrument was acknowledged before me this 8th day of May, 2012, by Blanca Cecilia Jimenez, joined by her husband Candido Pozo, who [ ] are personally known to me or [ ] have produced Florida Drivers Licenses, as identification.

Notary Public

Print Name:

My Commission Expires:

JORGE V. DE ONA
Notary Public - State of Florida
My Comm. Expires Nov 2, 2014
Commission # EE 39490

CFN 2012R0355423
OR Bk 28116 Pgs 3264 - 3266; (3pgs)
RECORDED 05/18/2012 09:56:50
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

# ASSIGNMENT
# OF
# LEASES, RENTS AND PROFITS

THE ASSIGNMENT OF LEASES, RENTS AND PROFITS (the "Assignment") made this 8th day of May, 2012, by and between,

**Blanca Cecilia Jimenez, joined by her husband Candido Pozo**
hereinafter referred to as "ASSIGNOR".
and
**B e r n a r d o   G o e n a g a**
hereinafter referred to as "ASSIGNEE."

WITNESSETH:

A)  ASSIGNEE has agreed to make loans and extensions of credit (the "Loans") to ASSIGNOR, to be evidenced by a promissory note ("Note") of even date herewith in the original principal amount of One Hundred Thirty Five Thousand and No/100 Dollars (U.S.$135,000.00).

B)  ASSIGNOR is the owner of real property more particularly described as:

Lot 18, in Block 32, of ESSEX VILLAGE FOURTH EDITION, according to the Plat thereof, as recorded in Plat Book 46, at Page 63, of the Public Records of Miami-Dade County, Florida.

Property Address:    57 Essex Avenue, Hialeah, Florida 33010

### THIS IS A BALOON MORTGAGE

AS (the "Property"), and has, simultaneously herewith, executed and delivered to ASSIGNEE a Mortgage (the "Mortgage") encumbering said Property as security for payment of the Note.

C)  As additional security for payment of the Note, and any renewals, extensions or modifications thereof, and to secure performance of all its obligations under the Mortgage, ASSIGNEE has requested ASSIGNOR to assign ASSIGNOR'S Lessor's interest in all present and future leases of the Property.

NOW, THEREFORE, in order to secure ASSIGNOR'S obligations to ASSIGNEE, it is agreed between the parties as follows:

1)  ASSIGNOR does hereby sell, transfer and assign to ASSIGNEE, its successors and assigns, all of the right, title and interest of ASSIGNOR in and to the rents, issues, profits, revenues, royalties, rights and benefits from the Property, and to that end ASSIGNOR hereby assigns and sets over unto the ASSIGNEE, its successors and assigns, all leases (the "Leases") of said premises now made, executed or delivered, whether written or verbal, or to be hereafter made, be the same written or verbal.

2)  ASSIGNOR does hereby authorize and empower ASSIGNEE, its successor and assigns, to collect said rents, issues, profit, revenues, royalties, rights and benefit as they shall become due; and does hereby direct the lessees ("the Lessees") under the Leases to pay such rents as they may now be due and payable, or as they shall hereafter become due and payable, to ASSIGNEE, its successors and assigns, which payments shall be applied by ASSIGNEE in reduction of principal and interest payments under the Note. It is understood and agreed, however, that no such demand shall be made upon the Lessees unless and until there has been a default by ASSIGNOR in the payment of the Note, or default in the terms and provisions of this Assignment, or any other agreements or security instruments entered into between ASSIGNOR and ASSIGNEE, and until such demand is made, ASSIGNOR is authorized to collect, or continue collection said rents, issues, profits, revenues, royalties, rights and benefits; but that such privilege to collect, or continue collecting, as aforesaid, by ASSIGNOR, shall not operate to permit the collection by ASSIGNOR, its successors or assigns, of any installment of rent in advance of the date prescribed in said leases for the payment thereof.

ASSIGNOR covenants and agrees that the affidavit, certificate, letter or written statement of any officer or agent of ASSIGNEE stating that ASSIGNOR has not fully satisfied all obligations to ASSIGNEE, shall be and constitute conclusive evidence of the validity, effectiveness and continuing force of this Assignment, and any person may and is hereby authorized to rely thereon. ASSIGNOR hereby authorizes and directs the lessees that, upon receipt from ASSIGNEE of written notice of any default by ASSIGNOR in any of the covenants of any agreements executed in connection with any loans or extensions of credit from ASSIGNEE to ASSIGNOR, or that a default exists

Page 1 of 3

under this Assignment, said Lessees are to pay over to ASSIGNEE all rents, income and profits arising and accruing under said Leases, or from the premises described therein, and to continue so to do until otherwise notified by ASSIGNEE.

3) ASSIGNOR hereby constitutes and appoints ASSIGNEE, its true, lawful and irrevocable attorney-in-fact, to demand, receive and enforce payment, and to give receipts, releases, satisfactions for, and to sue for all monies payable to ASSIGNOR, and this may be done either in the name of ASSIGNOR or in the name of ASSIGNEE with the same force and effect as ASSIGNOR could do if this Assignment had not been made.

ASSIGNOR also hereby authorizes ASSIGNEE, upon default under any agreements between the parties, to take over and assume such management, operation and maintenance of the leased premises as may be required by the Leases, and to perform all acts necessary and proper, and to expend such sums out of the income of the Leases as may be needed in connection therewith, in the same manner and to the same extent as ASSIGNOR theretofore might do, including the right to effect new leases, to alter or amend the terms of existing leases, or the renew any existing Leases; ASSIGNOR hereby releases all claims against ASSIGNEE arising out of the management, operation and maintenance of the leased premises excepting the liability of ASSIGNEE to apply the monies collected, after payment of all expenses and fees.

ASSIGNEE, upon taking over and assuming the management, operation and maintenance of any or all of the leased premises, shall, after payment of all proper charges and expenses including reasonable compensation to such managing personnel as it shall select and employ, after the accumulation of reserve to meet any taxes, assessments, fire and liability insurance premiums, credit the net amount of income received by ASSIGNEE from the leased premises by virtue of this Assignment to any amounts due and owing to ASSIGNEE from ASSIGNOR, but the manner of the application of such net income and what items shall be credited shall be determined in the sole discretion of ASSIGNEE. ASSIGNEE shall not be accountable for more monies than it actually receives and collects from the Property, nor shall it be liable for laches or for failure to collect rents, profits, royalties, and benefits.

4) Upon occurrence of a default by ASSIGNOR in payment of the Note or a default by ASSIGNOR under any agreement with, or obligation to, ASSIGNEE, ASSIGNEE shall have and may exercise, with respect to the Leases, any and all rights and remedies of a Secured Party under the Uniform Commercial Code and any and all rights and remedies available to it under any other applicable law; any Notice of Sale or disposition or other intended action by ASSIGNEE, with respect to any Leases, sent to ASSIGNOR by Certified mail, return receipt requested, at the last address for ASSIGNOR in ASSIGNEE's records, at least five (5) days prior to such action, as determined from date of refusal or delivery, shall constitute reasonable notice to ASSIGNOR; ASSIGNOR shall promptly pay all cost of ASSIGNEE for enforcement of its rights hereunder, including reasonable attorney's fees and legal expenses.

5) ASSIGNOR agrees as follows:

   (a)  ASSIGNOR will not agree to, consent to or permit any amendment, modification, termination or assignment of any of the Leases, without ASSIGNEE'S prior written consent.

   (b)  ASSIGNOR will keep and perform all of the obligations to be performed on its part under the leases and will save ASSIGNEE harmless from any failure to do so.

   (c)  Notwithstanding this Assignment, or any notice thereof, the ASSIGNEE shall not be obligated to perform any of the obligation on the part of ASSIGNOR arising under any Leases.

   (d)  ASSIGNOR will, on request of ASSIGNEE, execute and deliver to ASSIGNEE, in recordable form, separate assignments for each lease presently existing on any portion of the Property, and execute and deliver to ASSIGNEE, in recordable form, separate assignments for each lease(s) which relates to any portion of the Property, which are entered into by the ASSIGNOR with third parties subsequent to the date hereof.

6) ASSIGNOR represents and warrants to ASSIGNEE that:

   (a)  It is the owner of all Leases herein assigned and of the Property which is the subject matter of said Leases, free and clear of any liens or encumbrances, with full rights to convey its interest in the same.

   (b)  Said Leases are in full force and effect, and the Lessees therein are not in default under same.

   (c)  Said Leases are valid and enforceable and have not been altered, modified or amended in any manner whatsoever.

   (d)  ASSIGNOR has not, and will not, execute any other assignment of its interest in said Leases, nor the income, rents and profits therefrom, and has not, and will not hypothecate, mortgage or otherwise encumber said interest.

ASSIGNOR will not modify the terms of said Leases, give any consent or exercise any option required or permitted by said Leases, without the prior written consent of ASSIGNEE.




LAST PAGE

(f) In the event of sale by ASSIGNOR of any of the Leases and/or Property to any third party, or to the Lessees thereunder, the proceeds from said sale shall be paid to ASSIGNEE to be applied against ASSIGNOR'S obligations to ASSIGNEE.

7) Upon repayment in full to ASSIGNEE by ASSIGNOR of the Note, and when all obligations of ASSIGNOR to ASSIGNEE, however or whenever created, have been satisfied and discharged in full, ASSIGNEE'S security interest in the Leases of the Property shall be null and void and shall be reassigned to ASSIGNOR, without recourse, representation or warranty; otherwise, this Assignment shall be and remain in full force and effect.

8) Nothing contained in this Assignment, and no act done or omitted by ASSIGNEE pursuant to the power and rights granted ASSIGNEE hereunder, shall be deemed to be a waiver by ASSIGNEE of its rights and remedies under the Note or any other agreement by and between the parties hereto, and this Assignment is made and accepted without prejudice to any of the rights and remedies possessed by ASSIGNEE under the terms of any of such other agreements. The right of ASSIGNEE to collect such principal sum, interest and indebtedness, and to enforce any other security therefore held by ASSIGNEE, may be exercised by ASSIGNEE either prior to, simultaneously with or subsequent to any action taken by assignee hereunder.

9) This Assignment has been delivered in the State of Florida and shall be construed in accordance with the Laws of Florida. The Uniform Commercial Code shall govern the rights, duties and remedies of the parties, and any provisions herein declared invalid under any law shall not invalidate any other provision of this Assignment.

10) This Assignment shall be construed as a Security Agreement under the provisions of the Uniform Commercial Code as adopted by the State of Florida, from time to time, and ASSIGNEE shall be construed as a Second Party under said Uniform Commercial Code with a security interest in all the Leases, and all rents, issues, profits, revenues, royalties, proceeds, rights and benefits thereunder.

11) This Assignment shall inure to the benefit of the ASSIGNEE, its personal representative, heirs, successors and assigns, and shall be binding upon ASSIGNOR, its heirs, legal representative, successors and assigns.

IN WITLESS WHEREOF, ASSIGNOR has caused these presents to be executed the day and year first above written.

Witnessed By: (ASSIGNOR):

_____

Witness:                                          Blanca Cecilia Jimenez

_____

Witness:                                          Candido Pozo

STATE OF FLORIDA

COUNTY OF MIAMI-DADE

The foregoing instrument was acknowledged before me this 8th day of May, 2012 by Blanca Cecilia Jimenez, joined by her husband Candido Pozo, who are personally known to me or who have produced Florida Drivers Licenses, as identification and who did not take an oath.

NOTARY PUBLIC:

JORGE V. DE ONA
Notary Public - State of Florida
My Comm. Expires Nov 2, 2014
Commission # EE 39490

Sign _____
Print _____
{Notarial Seal} My Commission expires:
My commission number is:

Page 3 of 3

# EXHIBIT
## "B"

B6D (Official Form 6D) (12/07)

In re   **Blanca Cecilia Jimenez**                                             Case No.   **15-20695**
_____
Debtor

## SCHEDULE D - CREDITORS HOLDING SECURED CLAIMS

State the name, mailing address, including zip code, and last four digits of any account number of all entities holding claims secured by property of the debtor as of the date of filing of the petition. The complete account number of any account the debtor has with the creditor is useful to the trustee and the creditor and may be provided if the debtor chooses to do so. List creditors holding all types of secured interests such as judgment liens, garnishments, statutory liens, mortgages, deeds of trust, and other security interests.

List creditors in alphabetical order to the extent practicable. If a minor child is a creditor, the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m). If all secured creditors will not fit on this page, use the continuation sheet provided.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor" ,include the entity on the appropriate schedule of creditors, and complete Schedule H - Codebtors. If a joint petition is filed, state whether the husband, wife, both of them, or the marital community may be liable on each claim by placing an "H", "W", "J", or "C" in the column labeled "Husband, Wife, Joint, or Community".

If the claim is contingent, place an "X" in the column labeled "Contingent". If the claim is unliquidated, place an "X" in the column labeled "Unliquidated". If the claim is disputed, place an "X" in the column labeled "Disputed". (You may need to place an "X" in more than one of these three columns.)

Total the columns labeled "Amount of Claim Without Deducting Value of Collateral" and "Unsecured Portion, if Any" in the boxes labeled "Total(s)" on the last sheet of the completed schedule. Report the total from the column labeled "Amount of Claim" also on the Summary of Schedules and, if the debtor is an individual with primarily consumer debts, report the total from the column labeled "Unsecured Portion" on the Statistical Summary of Certain Liabilities and Related Data.

☐   Check this box if debtor has no creditors holding secured claims to report on this Schedule D.

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See instructions above.) | C O D E B T O R | Husband, Wife, Joint, or Community | | DATE CLAIM WAS INCURRED, NATURE OF LIEN, AND DESCRIPTION AND VALUE OF PROPERTY SUBJECT TO LIEN | C O N T I N G E N T | U N L I Q U I D A T E D | D I S P U T E D | AMOUNT OF CLAIM WITHOUT DEDUCTING VALUE OF COLLATERAL | UNSECURED PORTION, IF ANY |
|---|---|---|---|---|---|---|---|---|---|
| | | H W J C | | | | | | | |
| Account No. xxxxxx3823 | | | | Mortgage Loan | | | | | |
| EMC Mortgage Corp 2780 Lake Vista Dr Lewisville, TX 75067 | | - | | 4050 NW 135 Street # 6-2, Opa Locka, FL 33054 | | | | | |
| | | | | Value $            28,200.00 | | | | 65,751.00 | 37,551.00 |
| Account No. | | | | Mortgage Lender | | | | | |
| Goenage Bernardo 600 Biltmore Wayy #509 Miami, FL 33134 | | | | 57 Essex Ave, Hialeah, FL 33010 | | | | | |
| | | | | Value $           129,746.00 | | | | 148,000.00 | 18,254.00 |
| Account No. xxxxx9396 | | | | Mortgage Loan | | | | | |
| Nationstar Mortgage 350 Highland Drive Lewisville, TX 75067 | | - | | 8020 NW 36 Place, Miami, Florida 33147 | | | | | |
| | | | | Value $            97,750.00 | | | | 283,542.41 | 185,792.41 |
| Account No. 6-2 | | | | Condo Association | | | | | |
| Villa Biscaya Jardines Condo Phase I 5901 NW 151 St #100 Miami Lakes, FL 33014 | | | | 4050 NW 135 Street # 6-2, Opa Locka, FL 33054 | | | | | |
| | | | | Value $            28,200.00 | | | | 28,000.00 | 28,000.00 |

**0**   continuation sheets attached

| | Subtotal (Total of this page) | 525,293.41 | 269,597.41 |
|---|---|---|---|
| | Total (Report on Summary of Schedules) | 525,293.41 | 269,597.41 |

# COMPOSITE
# EXHIBIT
# "C"

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**
www.flsb.uscourts.gov

In re:                                                        Case No.: 23-18204-RAM

**BLANCA CECILIA JIMENEZ,**                    Chapter 13
       **Debtor.**

_____/

**DECLARATION OF INDEBTEDNESS**
**IN SUPPORT OF MOTION FOR RELIEF FROM THE AUTOMATIC STAY**

CRAIG B. SHAPIRO, makes this Declaration pursuant to 28 U.S.C. § 1746, and states:

1.      The indebtedness due and owing by Debtors to Movant as of Petition date is $182,726.06, plus attorneys' fees of $8,250, plus costs of $2,858.93, for a total of **$193,834.99**. This is based on information derived from records that were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, or a person with knowledge of those matters, the records were kept in the course of the regularly conducted activity and were made by the regularly conducted activity as a regular practice and information from Debtor's under oath .

2.      The Declarant certifies that all documents attached to the Motion for Stay Relief as an exhibit are true and accurate copies.

3.      This Affidavit is executed under penalty of perjury as being  true and correct based on personal knowledge of movants books and records.

**28 U.S.C § 1746 Declaration**

I declare under penalty of perjury that the foregoing is true and correct.  Executed on November 1, 2023.

_____
CRAIG B. SHAPIRO
Florida Bar No. 105295

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**
**www.flsb.uscourts.gov**

In re:                                                    Case No.: 23-18204-RAM

BLANCA CECILIA JIMENEZ,                    Chapter 13
        Debtor.
_____/

## DEBT AS OF THE PETITION DATE

A.      Total pre-petition indebtedness of Debtor owed to movant, Secured Creditors,
CARMAN GOENAGA and JACQUELINE GOENAGA, as personal representatives of the
estate of Bernardo Goenaga ("Movant" or "Estate"),(if Movant is not the lender, this refers to the
indebtedness owed to the lender) as of petition filing date: $193, 843.99

**which includes:**

| | | |
|---|---|---|
| 1. | Amount of principal: | $ 140,000.00 |
| 2. | Amount of interest: | $ 42,317.76 |
| 3. | Amount of escrow (taxes and insurance): | $ N/A |
| 4. | Amount of forced placed insurance expended by | $ N/A |
| 5. | Amount of attorney's fees billed to debtor(s) Pre-petition: | $ 8,250.00 |
| 6. | Amount of pre-petition late fees, if any, billed to debtor(s): | $   408.30 |
| 7. | Any additional pre-petition fees, charges or amounts | |

Charged to debtors/debtors account and not listed above:

(costs of Foreclosure)                                          $2,858.93

B.      Contractual interest rate: 18%

## AMOUNT OF ALLEGED POST-PETITION DEFAULT

C.      Date las payment was received:      None

D.      Alleged total number of payments due post petition from filing of petition through
        payment: N/A  Note is due.

E.      All post petition payments alleged to be in default:  default interest at 18%, 69.04 per-diem

F.      Amount of movant's fees billed to debtor for the preparation, and filing and prosecution of this motion:                                           $1,500.00

G.      Amount of movant's filing fee for this motion:                        $188.00

H.      Other attorney's fees billed to debtor post-petition:               $ NA

I.       Amount of movant's post-petition inspection fees:                 $ N/A

J.      Amount of movant's post-petition appraisal broker's  price opinion:$ N/A

K.      Amount of forced placed insurance or insurance provided by the movant post-petition:                                                          $ N/A

L.      Sum held in suspense by movant in connection with this contract,   $ N/A

M.      Amount of other post-petition advances or charges, for example taxes, insurance incurred by debtor, etc., (itemize each charge):               $ N/A

2